[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10073

_____

IN RE:

JAMES DANIEL WISNER,

Debtor.

_____

JAMES DANIEL WISNER,

Plaintiff-Appellee,

*versus*

THE PIEDMONT BANK,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-03782-ELR

————————————————

Before WILSON, JILL PRYOR, and HULL, Circuit Judges.

PER CURIAM:

This case arises from an adversary bankruptcy proceeding brought by Piedmont Bank against James Wisner. Piedmont alleged that Wisner's debt to Piedmont was non-dischargeable in bankruptcy under 11 U.S.C. § 523(a)(6). The district court concluded that Piedmont lacked a sufficient interest in the injured property to support a non-dischargeability claim. This appeal requires us to consider whether, under Georgia law, the initiation and service of an action seeking to levy on corporate stock—without actual seizure of the stock certificate—establishes an interest in the stock sufficient to support a non-dischargeability claim under § 523(a)(6). After careful review, and with the benefit of oral argument, we conclude that it does not. We affirm in part, vacate in part, and remand for further factual findings.

# I.    BACKGROUND[1]

In 1987, Wisner acquired 90 percent of the outstanding shares of stock in Atlanta Arms & Ammo, Inc. ("AA&A"). The stock shares were evidenced by a stock certificate.

Decades later, Wisner guaranteed a debt owed to Piedmont by a third party. When the third party defaulted and Wisner failed to perform under the guarantee, Piedmont sued Wisner in Georgia state court for breach of contract to enforce the guarantee. In August 2013, the Superior Court of Newton County entered a final judgment against Wisner and other defendants for the outstanding debt (the "Judgment").

Following entry of the Judgment, Piedmont filed a collateral action in state court seeking to levy on Wisner's shares in AA&A. Specifically, Piedmont sought "charging orders against Wisner's financial interests in" AA&A and "an order compelling Wisner to turn over and assign all shares of all corporations that he own[ed] to the Court to be sold at auction." Doc. 6-1 at 11.[2] Wisner was served with the petition and summons in the levy action in October 2013. Despite filing an action intended to do so, Piedmont never levied on the stock.

---

[1] Because we write for the parties, we assume their familiarity with the facts and issues.

[2] "Doc." numbers refer to the district court's docket entries.

After receiving the summons in the collateral action, Wisner and AA&A entered into an agreement to sell many of AA&A's physical assets to another company, Hairy & Baxter, LLC. Central to this appeal, the parties dispute when the sale of assets was consummated. Wisner maintains that it occurred on February 6, 2014, whereas Piedmont argues it was not completed until April 1, 2014. The agreement had a closing date of April 1, 2014, but it specified that "[n]otwithstanding the foregoing, the purchase and sale of the Acquired Assets under this Agreement shall be deemed to have taken place on the Effective Date" of February 6, 2014. Doc. 5-12 at 47.

On February 27, 2014, Piedmont filed a motion for injunctive relief and expedited hearing in the pending levy action, requesting the court's assistance in reaching Wisner's AA&A stock. Piedmont also asked the court to enjoin Wisner from transferring or encumbering the stock until the matter was resolved. The next day, the state superior court issued an order enjoining Wisner from "transferring, encumbering, selling, concealing, assigning, withdrawing, conveying, gifting, wasting, or otherwise disposing in any way, any of the certificated securities in his possession or control, related to or held in [AA&A]" (the "Injunction"). Doc. 5-22 at 39. In the same order, the superior court scheduled a hearing on Piedmont's motion for March 13, 2014, to resolve Piedmont's request for a court order requiring Wisner to relinquish his shares in AA&A. The court ordered Wisner to appear at the hearing and be

prepared to turn over the AA&A stock certificate to Piedmont or to the court pending final disposition of the motion.

The hearing never took place, however. Before the hearing was held, Wisner agreed to surrender the stock certificate to Piedmont, and Piedmont had the hearing removed from the court calendar. A senior vice president for Piedmont testified that the bank cancelled the hearing with the intention that the stock would be held by Piedmont in pledge against the Judgment. He further testified that had Piedmont known about the pending sale to Hairy & Baxter, the bank would not have agreed to cancel the hearing. Wisner turned over the AA&A stock certificate to Piedmont on March 14, 2014.

When Piedmont learned of the sale of AA&A's assets to Hairy & Baxter, it filed a motion in the pending levy action to hold Wisner in contempt for violating the Injunction. In response, Wisner argued that he was not in contempt of the Injunction because the sale to Hairy & Baxter had concluded on February 6, before the Injunction's entry. The court nonetheless held Wisner in contempt and then entered the parties' consent order to resolve the motion for contempt. The consent order required Wisner to make a lump sum payment to Piedmont as well as ongoing monthly payments to satisfy his debt. Wisner paid the lump sum and the monthly payments until he filed for Chapter 7 bankruptcy about two years later.

In bankruptcy court, Piedmont brought an adversary proceeding against Wisner, alleging that his debt to Piedmont was non-dischargeable under 11 U.S.C. § 523(a)(6), which excepts from

discharge "any debt . . . for willful and malicious injury by the debtor to . . . the property of another entity." Specifically, Piedmont alleged that Wisner had willfully and maliciously injured the AA&A stock by "transferring and allegedly selling all of [AA&A's] assets to Hairy & Baxter, LLC."[3] Doc. 8-1 at 8.

Wisner moved for summary judgment in the adversary proceeding, arguing that Piedmont lacked a sufficient property interest in AA&A at the time of the alleged injury to support a § 523(a)(6) non-dischargeability claim. The bankruptcy court denied summary judgment, explaining that although Piedmont was not the owner of the AA&A stock, it had a sufficient property interest:

> [C]onsidering the particular circumstances of this case, where a collateral proceeding is pending and where Piedmont ha[d] possession of the stock with [Wisner's] consent, which was given in the face of an order in the AA&A Action that evidenced the intent of the Newton County Court to protect Piedmont's ability to levy on the stock, there exists a sufficient interest to satisfy the interest requirement under § 523(a)(6).

Doc. 5-26 at 12. Thus, the bankruptcy court concluded, "Piedmont's judgment lien attached to the stock upon service of the summons in the AA&A Action and Piedmont ha[d] an interest in

---

[3] Piedmont also alleged that Wisner's debt was non-dischargeable under 11 U.S.C. § 523(a)(2)(A) and 523(a)(2)(B). The bankruptcy court granted Wisner's motion for summary judgment on these claims.

the stock." *Id.* The court scheduled a trial to determine whether Piedmont could establish the remaining elements of its § 523(a)(6) claim: namely, whether the sale of AA&A's assets amounted to willful and malicious injury to Piedmont's interest in the AA&A stock.

After a two-day trial, the bankruptcy court issued an oral ruling. In its oral ruling, the bankruptcy court identified the issue at trial as whether Wisner "had willfully and maliciously injured the bank's interest in the stock of [AA&A] . . . by his conduct in selling the assets of [AA&A] prior to the hearing in the state court scheduled for March 13th, 2014." Doc. 7-15 at 6. The bankruptcy court concluded that "any debt that the Newton County Court determined is attributable to Mr. Wisner's actions in selling [AA&A] and taking distributions of the remaining value of the company is nondischargeable, pursuant to Section 523(a)(6)." *Id.* at 21.

Regarding the timing of the asset sale, the bankruptcy court found that Hairy & Baxter paid for the equipment and inventory on the asset sale agreement's effective date—February 6th, 2014—and received a bill of sale to that effect. But despite the February 6 effective date and consummated sale of equipment and inventory on that date, the bankruptcy court stated that "the sale was consummated on February 26, 2014." Doc. 7-15 at 19. The court further found that when the bank removed the March 13 hearing from the state court calendar, "Mr. Wisner had already consummated the sale and admitted that [AA&A] had become worthless through the sale and distributions taken." *Id.* at 20. The bankruptcy court

did not address the significance of the sale agreement's closing date of April 1. Nor did the bankruptcy court explicitly distinguish between allegedly injurious acts that occurred before or after the turnover of the stock certificate on March 14.

Wisner appealed the bankruptcy court's ruling to the district court. On appeal, Wisner reiterated his argument that Piedmont lacked a sufficient property interest in the AA&A stock to support a § 523(a)(6) claim. The district court agreed, concluding that a judgment lien did not attach to the AA&A stock upon the filing and service of the levy action. The district court further concluded that, regardless of whether Piedmont gained a property interest after the turnover of the stock certificate on March 14, the alleged injurious acts, including the sale of assets to Hairy & Baxter, occurred before the turnover. The district court noted that it was unclear whether the bankruptcy court found that the asset sale took place on February 6 or February 26. "Nonetheless," the district court concluded, "it is clear that the Bankruptcy Court found that the Sale Agreement was consummated during February 2014, before Wisner turned over the AA&A stock certificate to Piedmont." Doc. 17 at 27. Thus, Piedmont could not establish a § 523(a)(6) claim. Piedmont timely appealed.

## II.    STANDARD OF REVIEW

We review *de novo* conclusions of law, whether by the bankruptcy court or the district court. *In re Jennings*, 670 F.3d 1329, 1332 (11th Cir. 2012). We review the bankruptcy court's factual

findings for clear error. *Id.* "If the bankruptcy court is silent or ambiguous as to an outcome determinative factual question, the case must be remanded to the bankruptcy court for the necessary factual findings." *In re JLJ Inc.*, 988 F.2d 1112, 1116 (11th Cir. 1993).

## III.    DISCUSSION

A discharge in bankruptcy "does not discharge an individual debtor from any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The issue on appeal is whether Piedmont had a sufficient interest in the AA&A stock to assert a § 523(a)(6) non-dischargeability claim.[4] Piedmont makes two arguments on appeal for why it had such an interest. First, Piedmont contends that it acquired a sufficient property interest in the AA&A stock when it initiated and served the collateral action seeking to levy on the stock. Second, Piedmont argues that it gained a property interest in the stock when Wisner voluntarily turned over the stock certificate and that the sale of AA&A's assets took place after it had gained this interest. We address each argument in turn.

---

[4] On appeal to the district court, Wisner argued for the first time that his actions in selling AA&A's assets did not create a debt to Piedmont under § 523(a)(6). The district court properly determined Wisner had waived this issue, and thus we do not address it.

### A. The Initiation and Service of the Levy Action Did Not Give Piedmont a Sufficient Property Interest in the AA&A Stock.

Piedmont contends that the district court erred by concluding that the initiation and service of the levy action upon Wisner did not give Piedmont a sufficient interest in the AA&A stock to support a § 523(a)(6) claim. To determine whether the initiation and service of the levy action vested Piedmont with a sufficient property interest in the stock, we look to Georgia state law. *See Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law.").

Under Georgia law, judgments "bind all the property of the defendant in judgment, both real and personal, from the date of such judgments except as otherwise provided" by statute. O.C.G.A. § 9-12-80. Notably, a judgment lien does not automatically attach to a chose in action such as the corporate stock at issue here unless specifically provided by statute. *See* O.C.G.A. § 9-13-57 ("Choses in action are not liable to be seized and sold under execution, unless made so specially by statute."); *Fourth Nat. Bank of Macon v. Swift & Co.*, 127 S.E. 729, 731 (Ga. 1925) (noting that corporate stock is a chose in action). Rather, "to reach the property of the debtor in such choses in action, some other additional proceeding is necessary to fix the lien of such judgments." *Fid. & Deposit Co. of Md. v. Exch. Bank of Macon*, 28 S.E. 393, 395 (Ga. 1897). As the Georgia Supreme Court has explained, the property "must be reached either by process of garnishment, or by some collateral

proceeding instituted for the purpose of impounding it so that it can be applied in satisfaction of the judgment." *Id.* Significantly, "[u]ntil it has been so seized by the courts for the purpose of appropriating it to the payment of the judgment, it is still subject to the dominion and control of the debtor." *Id.*

Piedmont concedes that it never levied on the stock but argues that the initiation of the levy action targeting the AA&A stock vested it with a sufficient interest. However, "[t]he interest of a debtor in a certificated security may be reached only by actual seizure of the security certificate by the officer making the attachment or levy." O.C.G.A. § 11-8-112. Thus, as the district court explained, "a judgment lien on corporate shares in the possession of a debtor can only attach through the *actual* seizure of a stock certificate by a levying officer." Doc. 17 at 20 (emphasis in original).

Piedmont contends that this reading of Georgia law erroneously conflates possession with the attachment of an interest. It further argues that nothing in Georgia law forecloses the possibility that a judgment lien may attach *before* a debtor is divested of possession through actual seizure. We reject its contention. As noted above, Georgia law is clear that corporate stock is a chose in action, and judgments do not automatically attach to choses in action. *See* O.C.G.A. § 9-13-57. "Choses in action are not liable to be seized and sold under execution, unless made so specially by statute." *Id.* The *absence* of law *prohibiting* the attachment of a judgment lien based solely on the initiation of an action seeking to levy on the stock therefore cannot support Piedmont's position. The only

mechanism in Georgia law for the seizure of and levy on stock is O.C.G.A. § 11-8-112, which provides that in these circumstances[5] the debtor's interest in a certificated security may only be reached by actual seizure of the security certificate. *See id.* § 11-8-112(a).

Piedmont further argues it was asserting its present interest in the AA&A stock by seeking judicial aid to which it is entitled under O.C.G.A. § 11-8-112(e). Georgia law provides that "[a] creditor whose debtor is the owner of a certificated security . . . is entitled to aid from a court of competent jurisdiction . . . in reaching the certificated security." *Id.* § 11-8-112(e). Although this language entitles a creditor to judicial aid "in reaching the certificated security," it does not establish that the interest *is* reached by the request for aid. The request for judicial aid, by itself, does not give the creditor an interest in the certificated security necessary to support a § 523(a)(6) claim. Thus, the district court correctly concluded that

---

[5] The statute provides exceptions to the actual-seizure requirement where the security certificate has been surrendered to the issuer or is in the possession of a secured party. *See* O.C.G.A. § 11-8-112(a), (d). In such circumstances, the debtor's interest in the certificated security may be reached by legal process upon the issuer or the secured party in possession of the security certificate. *See id.* The existence of these exceptions underscores that the initiation and service of the levy action here was insufficient to reach the AA&A stock. In the exceptions, the Georgia legislature contemplated scenarios where a debtor's interest in a certificated security may be reached without actual seizure of the security certificate, but the legislature declined to provide for an exception in the circumstances present here. Actual seizure is required unless the certificate has been surrendered to the issuer or is in the possession of a secured party.

Piedmont did not have a sufficient property interest in the AA&A stock based on the initiation and service of the collateral action seeking to levy on the stock.

### B. Questions of Fact Remain as to Whether Piedmont Had a Security Interest in the AA&A Stock and Whether the Sale of AA&A Assets Occurred After Piedmont Acquired that Interest.

Alternatively, Piedmont argues that it obtained either an ownership interest or a security interest in the AA&A stock when Wisner turned over the stock certificate on March 14. It argues further that Wisner's actions after he turned over the stock certificate injured this interest. Specifically, it contends that the sale of AA&A's assets to Hairy & Baxter was not consummated until the closing date of April 1, after Piedmont had gained a security interest in the stock by obtaining possession of the certificate.

The bankruptcy court did not determine whether Piedmont acquired a sufficient interest in the AA&A stock when the stock certificate was turned over because the court concluded instead that Piedmont gained an interest in the stock upon the initiation of the levy action. For the same reason, the bankruptcy court made no factual findings concerning the timing of the asset sale to Hairy & Baxter. Because the bankruptcy court's findings are ambiguous on these outcome-determinative factual questions, we must remand. *See In re JLJ Inc.*, 988 F.2d at 1116.

A security interest in a certificated security attaches and becomes enforceable when (1) "value has been given[,] (2) [t]he debtor has rights in the collateral or the power to transfer rights in the collateral to a third party[,]" and (3) "the security certificate has been delivered to the secured party . . . pursuant to the debtor's security agreement." O.C.G.A. § 11-9-203(b)(1)–(3).

Here, the latter two elements are satisfied. First, it is undisputed that Wisner owned the stock and had the power to transfer rights in the stock to Piedmont. Second, as the bankruptcy court concluded, Wisner's turnover of the stock certificate was voluntary and the product of a consensual agreement between the parties. *See Barton v. Chem. Bank*, 577 F.2d 1329, 1333–34 (5th Cir. 1978)[6] (concluding that a valid oral security agreement existed where the secured party had possession of the collateral and circumstances supported that the asset was held in pledge). After obtaining the Judgment against Wisner, Piedmont brought a collateral proceeding seeking to levy on the AA&A stock. Wisner understood that Piedmont was trying to acquire his shares in AA&A through the pending levy action. The order of the superior court setting a hearing on Piedmont's motion for an injunction was intended to protect Piedmont's ability to levy on the stock. As the bankruptcy court explained, under these circumstances "the only conceivable

---

[6] Decisions of the former Fifth Circuit handed down prior to October 1, 1981, are binding on this Court. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

22-10073                Opinion of the Court                15

purpose for transferring the stock was to provide security for satisfaction of the judgment." Doc. 5-26 at 10 (alteration adopted) (internal quotation marks omitted). Thus, the court concluded, Wisner agreed to "turn[]the stock over to Piedmont . . . with the likely exchange being cancellation of the March 13 hearing." *Id.*

Although the evidence suggested that Wisner turned the stock over to Piedmont in exchange for cancellation of the impending hearing, and the bankruptcy court characterized this scenario as "likely," the court never made explicit factual findings to that effect. Despite having concluded in its order denying Wisner's motion for summary judgment that "a question of fact exists as to whether Piedmont holds a consensual lien in the stock," *id.* at 11, the court never resolved the underlying fact question whether value had been given to Wisner in exchange for turning over the stock certificate. Therefore, an issue of fact remains as to whether Piedmont acquired a security interest in the stock after Wisner surrendered the certificate to Piedmont on March 14.[7]

---

[7] Piedmont also argues that it obtained an interest as a "purchaser" of the stock under O.C.G.A. § 11-8-104(a)(1). Georgia law defines "purchase" with reference to the creation of an interest in the property. *See* O.C.G.A. § 11-1-201(29) (defining "purchase" as "taking by sale, discount, negotiation, mortgage, pledge, lien, security interest, issue or reissue, gift, or any other voluntary transaction creating an interest in property"). The bankruptcy court determined that "Piedmont may be a purchaser . . . if it can establish at trial that value was given in exchange for possession of the stock certificate." Doc. 5-26 at 11. As discussed above, the bankruptcy court did not resolve the factual

Assuming that Piedmont acquired a property interest in the AA&A stock after gaining possession of the stock certificate, it must also show that the stock was injured after Piedmont acquired that interest. This question about the timing of the injury turns on whether the sale of AA&A's assets to Hairy & Baxter was consummated on February 6, as Wisner contends, or on April 1, as Piedmont contends. The district court concluded that it did not matter whether Piedmont gained an interest in the AA&A stock after acquiring the stock certificate in March because the bankruptcy court found that the sale of AA&A's assets to Hairy & Baxter was consummated in February 2014. Because the sale—and thus the injury to the AA&A stock—took place before Piedmont acquired the stock certificate, the district court determined that Piedmont lacked a sufficient interest in the AA&A stock to support a non-dischargeability claim at the time of the alleged injury. Thus, the district court concluded, remand to the bankruptcy court for factual findings was unnecessary.

We disagree. Because the bankruptcy court concluded that Piedmont had a sufficient property interest in the AA&A stock after its initiation of the levy action in October 2013, the court had no reason to—and did not—make factual findings distinguishing between conduct that occurred before or after the surrender of the

---

question of whether value had been given to Wisner in exchange for the certificate.

stock certificate on March 14.[8] Although the bankruptcy court's oral ruling suggests that the sale was completed in February 2014 before the surrender of the stock certificate, the timing of the sale was not directly at issue. At best, the bankruptcy court's factual findings are ambiguous as to when the asset sale to Hairy & Baxter took place. If the sale occurred after Piedmont gained possession of the stock certificate, the injury to the AA&A stock caused by the sale may support a non-dischargeability claim if Piedmont had a property interest in the stock at that time. Accordingly, we remand to the district court with instructions to remand to the bankruptcy court for further findings of fact.

## IV.    CONCLUSION

For the above reasons, we affirm in part, vacate in part, and remand with instructions to remand to the bankruptcy court. On remand, the bankruptcy court should consider (1) whether Piedmont gained a property interest in the stock after Wisner surrendered the stock certificate and (2) if so, whether the asset sale injuring the AA&A stock occurred after Piedmont acquired that interest.

**AFFIRMED in part, VACATED in part, and REMANDED.**

---

[8] Piedmont asserts that additional injurious transactions occurred after it gained possession of the stock certificate on March 14. However, these transactions were independent of the asset sale agreement with Hairy & Baxter, which formed the basis for Piedmont's § 523(a)(6) non-dischargeability claim.